DAVID J. MILLSTEIN, SBN 87878
DMillstein@millsteinfellner.com
JASON E. FELLNER, SBN 245364
JFellner@millsteinfellner.com
MILLSTEIN FELLNER, LLP
100 The Embarcadero, Penthouse
San Francisco, California 94105
Telephone:    (415) 348-0348
Facsimile:    (415) 348-0336

**Attorneys for Plaintiffs**
ONE TRUE VINE, LLC; CALDERA RANCH, LLC; FEW AND FAR BETWEEN, LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ONE TRUE VINE, LLC; CALDERA RANCH, LLC; and FEW AND FAR BETWEEN, LLC,<br><br>    Plaintiffs<br><br>    v.<br><br>FIREMAN'S FUND INSURANCE COMPANY; and DOES 1-50,<br><br>    Defendants. | Case No.: 3:23-cv-01441-EMC<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>1. **BREACH OF CONTRACT;**<br>2. **BREACH OF CONTRACT;**<br>3. **INSURANCE BAD FAITH; and**<br>4. **INSURANCE BAD FAITH.** |

1.    Plaintiff ONE TRUE VINE, LLC ("OTV") is a California LLC, with operations in Saint Helena, California.

2.    Plaintiff CALDERA RANCH, LLC ("CR") is a California LLC, with operations in Saint Helena, California.

3.    Plaintiff FEW AND FAR BETWEEN, LLC ("FAFB") is a California LLC, with operations in Saint Helena, California.

4.    Defendant FIREMAN'S FUND INSURANCE CO. ("FIREMAN'S FUND" OR "INSURER") is an Illinois corporation that maintains a place of business in the State of California,

transacts business in the State of California, and has entered into contracts with PLAINTIFFS to be performed in the State of California.

5. FIREMAN'S FUND issued Policy No. USC013480200 (effective February 24, 2020 through February 24, 2021) (the "POLICY") to named insureds including Plaintiffs One True Vine, LLC, Caldera Ranch, LLC, and Few and Far Between, LLC (collectively, hereafter, "PLAINTIFFS").

6. PLAINTIFFS own and operate vineyards and wineries in Napa County, California, and are each named insureds in the POLICY, as reflected on the schedule of Named Insureds.

7. The POLICY includes coverage for fifteen (15) scheduled locations of various real property locations owned and/or operated by PLAINTIFFS.

8. The POLICY provides limits of $11,058,200 for claims arising under Business Real Property and Business Personal Property coverage for all scheduled locations, and a limit of $1,000,000 for Business Income and Extra Expense coverage for all scheduled locations.

9. PLAINTIFFS timely paid a significant premium to FIREMAN'S FUND in exchange for the insurance coverage provided under the terms of the POLICY.

10. On or around September 27, 2020, through no fault of PLAINTIFFS, a fire event commonly called the Glass Fire started in Napa and Sonoma Counties. The Glass Fire burned over 67,484 acres, destroyed 1,528 structures, and damaged another 282 structures before it was fully contained on or around October 20, 2020.

11. Several of PLAINTIFFS' vineyard and winery locations were directly impacted by the Glass Fire, including fire damage to locations 1, 5, 7 and 8 of the fifteen (15) scheduled locations (the "PROPERTIES") covered under the POLICY. The impacted scheduled properties are located in Napa County, at 3740 Silverado Trail N. in Saint Helena; 565 Crystal Springs Road in Saint Helena; and 3750 and 3764 Silverado Trail in Calistoga, California, respectively.

12. In addition to causing PLAINTIFFS to sustain significant property damage as a direct result of the fire, the Glass Fire impacted PLAINTIFFS' operations in a multifaceted and

devastating manner, causing PLAINTIFFS to lose the entire 2020 vintage and also to sustain unknown damage to PLAINTIFFS' customer goodwill and brand relevance, as described herein.

13. The Glass Fire coincided with PLAINTIFFS' crucial pre-harvest care of the grapes, the harvest operation itself, and the immediately ensuing crush of grapes at PLAINTIFFS' vineyard properties for the 2020 season, preventing PLAINTIFFS from accessing their PROPERTIES or engaging in any operations during the narrow window of time for grape harvest and crushing in 2020.

14. Because the Glass Fire was actively burning on or in the immediate vicinity of PLAINTIFFS' operations, it was unsafe, inadvisable, and physically impossible for PLAINTIFFS to access the PROPERTIES and reach their grapes during the harvest and crush period for the 2020 vintage.

15. In addition, civil evacuation orders issued by the Napa County Office of Emergency Services and related civil authorities also made it illegal for PLAINTIFFS to access their PROPERTIES between September 27, 2020 and October 4, 2020 for some of the PROPERTIES and between September 27, 2020 and October 11, 2020 for others.

16. At some point during the Glass Fire, while PLAINTIFFS were already unable to access the PROPERTIES, the electrical grid went out, negatively impacting irrigation systems for PLAINTIFFS' grape growing operations. PLAINTIFFS maintain a generator as a backup to use for irrigation when electricity fails. The backup generator and the water tanks PLAINTIFFS would have used to care for their grapevines in the final days before harvest, in the event of a power outage, were destroyed by the Glass Fire. Accordingly, even had PLAINTIFFS been able to access the PROPERTIES, the Glass Fire's impact on electricity operations and destruction of PLAINTIFFS' backup power system and irrigation systems further added to the complete inability of PLAINTIFFS to conduct their business operations during the crucial days before grape harvest, the harvest itself, and the immediately following grape crush.

17. PLAINTIFFS were unable to mitigate their damages due to the existence of the fire, the evacuation orders, their inability to access the PROPERTIES even without the evacuation orders prohibiting them from doing so, the lack of electricity, and the destruction of PLAINTIFFS' generator and irrigation tanks.

18. When PLAINTIFFS were eventually able to access the PROPERTIES after the Glass Fire receded and the evacuation orders were lifted, the grapes were overripe and unusable, and were also impacted by smoke and ash.

19. PLAINTIFFS have built a brand based on using only premium, estate grown grapes for the wine PLAINTIFFS produce. Because PLAINTIFFS could not care for, harvest, and crush the grapes during the Glass Fire, and also because the grapes were unusable after the Glass Fire, PLAINTIFFS were not able to produce any wine whatsoever for the 2020 vintage year. There were no replacement grapes PLAINTFFS could purchase to make wine, as PLAINTIFFS use only grapes they grow on their own PROPERTIES.

20. PLAINTIFFS estimate their lost revenue from the interruption to their business operations during the crucial pre-harvest, harvest and grape crush period in 2020 conservatively ranges between thirty million and sixty million dollars – well beyond the limits of the business interruption and civil authority claims PLAINTIFFS subsequently made to FIREMAN'S FUND.

21. The pre-harvest reports for the 2020 grape harvest indicated a strong harvest year with grape qualities that appeared poised to lend themselves to the creation of excellent wine, making the inability to create that wine even more devastating to PLAINTIFFS.

22. PLAINTIFFS lost customer relevance because they have no new wine to market or sell for the 2020 vintage year. The amount of damage the Glass Fire caused PLAINTIFFS in the loss of relevance and desirability of their brand is unknown and still being determined, but will unfortunately create a gap in PLAINTIFFS' marketing and branding for years to come.

23. Caldera Ranch, LLC and Few and Far Between, LLC hold title to the impacted PROPERTIES covered by the POLICY. One True Vine, LLC pays for the grapes grown and

harvested at Caldera Ranch, LLC and Few and Far Between, LLC and makes wine from them. Because the Glass Fire impacted the ability of all three related entities to operate by preventing each one from harvesting, crushing, selling or receiving the grapes grown on the PROPERTIES, the claims of the PLAINTIFFS are referred to collectively to prevent confusion. Each individual Plaintiff, however, has claims well in excess of the limits on business interruption and extra expense claims, and in excess of the limits on civil authority coverage.

24. PLAINTIFFS timely submitted claims to FIREMAN'S FUND for property damage, business interruption and civil authority business access losses arising from the Glass Fire under the POLICY.

25. FIREMAN'S FUND agreed to pay PLAINTIFFS benefits under the POLICY for certain covered property damage losses, and is still in the process of adjusting and paying claims to PLAINTIFFS under the POLICY for those property damage claims.

26. On September 20, 2021, PLAINTIFFS submitted information to FIREMAN'S FUND supporting PLAINTIFF'S claims under the Business Income and Extra Expense coverage and the Civil Authority Business Access provisions of the POLICY. This included PLAINTIFF'S request for Business Income and Extra Expense coverage afforded by Policy No. USC013480200 under Property-Gard Pinnacle Coverage Form 250000 01-13. The POLICY'S Business Income and Extra Expense insuring agreement covers "the actual loss of 'business income' and necessary 'extra expense' you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration' arising from direct physical loss or damage to property at a 'location', or within 1,000 feet of such 'location', caused by or resulting from a 'covered cause of loss'". PLAINTIFFS explained that there was direct physical loss or damage to property at a number of the scheduled locations, and the suspension of PLAINTIFFS' operations arose from this loss and damage to property, as the damage prevented PLAINTIFFS from procuring the grapes necessary to make wine. There were no other alternative grape sources because all of PLAINTIFFS' wines are produced from the highest quality estate-grown grapes. "Business income" includes the lost

"net sales value of manufacturing production". Because PLAINTIFFS could not produce wine due to the lack of grape supply, PLAINTIFFS lost 100% of the net sales value of its manufacturing production due to the suspension of its operations. As they explained, PLAINTIFFS' business interruption losses significantly exceed the policy's $1 million limit applicable to business interruption coverage.

27. In the same email on September 20, 2021, PLAINTIFFS requested coverage under the Civil Authority Business Access coverage provision afforded by Policy No. USC013480200 under Property-Gard Pinnacle Coverage Form 250000 01-13, based on the fact that CalFire barred access to PLAINTIFFS vineyards during the Glass Fire and PLAINTIFFS were unable to harvest the grapes during the designated harvest period, resulting in a complete loss of business income from the grapes far exceeding the $500,000 limit for this coverage provision.

28. On March 31, 2022, FIREMAN'S FUND's executive general adjustor, Paul Blanchard, sent an email to the claims adjustor for PLAINTIFFS stating, "Based on the business interruption claim presented . . . it appears the majority of their claim arises from damage sustained to grapes still on the vine and for the vines themselves. As you are likely aware, growing crops are not covered property . . . and as such would likely not trigger Business interruption coverage." As PLAINTIFFS' broker responded that same day, "The insured was not allowed to harvest due to CalFire stopping them from entering their property." This information does not appear to have been considered by FIREMAN'S FUND.

29. FIREMAN'S FUND at this juncture wrongfully and in bad faith chose to treat the claims as one for grape and vine losses only, when PLAINTIFFS had already provided information demonstrating they were completely unable to access their PROPERTIES to conduct operations, harvest grapes, or crush grapes to produce wine. The discussions after this point focused on the physical damage to the grapes and vines themselves, rather than the forced interruption of PLAINTIFFS business operations from the Glass Fire. FIREMAN'S FUND steered the coverage discussion away from business interruption losses in the hopes that it would thereafter be able to

deny the claim and save the million dollar limits on the business interruption portion of the claim and the $500,000 limits on the civil authority business access claim.

30. On March 29, 2022, PLAINTIFFS submitted additional information to FIREMAN'S FUND explaining the business interruption losses resulting from the loss of grapevines.

31. On April 4, 2022, FIREMAN'S FUND issued a reservation of rights in response to PLAINTIFFS' business interruption claims and civil authority business access claims arising from the Glass Fire.  In the email enclosing the reservation of rights, FIREMAN'S FUND noted that they had engaged a forensic accountant to "assist with the evaluation of your covered business interruption claim."  The forensic accountant thereafter requested a lengthy and harassing list information broken down in multiple ways ranging back to 2017, including but not limited to repetitive and unnecessary items such as "detailed monthly profit and loss statements from January 2018 through December 2020"; "Production reports from harvest-to-bottle by label for each lot for 2017, 2017, 2019, 2020," and "Provide the following by ranch/block/lot for 2017, 2018, 2019, 2020: i) Varietal; ii) Tonnage Yield; iii) Date harvested."  On information and belief, FIREMAN'S FUND was attempting to block the business interruption claim by making it impossible for PLAINTIFFS to comply with their requests for incredibly detailed, unnecessary information which would take weeks for multiple employees to compile, over a claim which could only result, at its very most, in a payout of $1 million dollars.

32. On or around May 5, 2022, PLAINTIFFS provided the requested bottling information for their products from 2017 forward, noting the lost revenue related to the 2020 vintage easily exceeded $50 million dollars and also noting the limits on the business interruption coverage provision was capped at $1 million.  PLAINTIFFS asked FIREMAN'S FUND what information they could provide to demonstrate they had incurred losses exceeding the $1 million limit without producing all records relating to relating back over the last several years.  The forensic accountant stated that the carrier had still not confirmed coverage and acknowledged

receipt of the request on May 16, 2022. PLAINTIFFS followed up with the forensic accountant on June 7, 2022.

33. On June 16, 2022, FIREMAN'S FUND issued a partial disclaimer under the Business Income or Extra Expense coverages of the POLICY, characterizing the claim as arising from burned grapevines, when the claim actually arose from the complete inability of PLAINTIFFS to access or operate at their PROPERTIES.

34. On June 22, 2022, the forensic accountant asked PLAINTIFF to "please give me a call when you get a chance to discuss Business Income losses that may have been sustained during the civil authority period." Later that day, the forensic accountant thanked PLAINTIFFS for a return voicemail and stated, "Thank you for your willingness to provide additional information. It sounds like there might be some confusion about coverage."

35. On June 30, 2022, FIREMAN'S FUND issued a denial letter under the Civil Authority Business Access provision of the POLICY for PLAINTIFF'S asserted losses of business revenue arising from evacuation orders issued in connection with the fire that started on or about September 27, 2020. The June 16, 2022 and June 30, 2022 letters are collectively referred to herein as the "DENIAL LETTERS".

36. The conduct of FIREMAN'S FUND in investigating and then issuing the DENIAL LETTERS relied on factually unsupported, legally strained interpretations of the POLICY and of PLAINTIFFS' claims under the POLICY. The denials were incorrect, unreasonable, and issued in bad faith. As a result of the position FIREMAN'S FUND took in the DENIAL LETERS, PLAINTIFFS were denied their full POLICY benefits.

37. To PLAINTIFFS' best knowledge, FIREMAN'S FUND has not issued any other position letters related to PLAINTIFFS' claims for business interruption coverage under the POLICY.

38. To date, FIREMAN'S FUND has not provided any coverage or made any payments whatsoever for the business interruption losses and civil authority business access coverage losses claimed by PLAINTIFFS.

39. Defendants, DOES 1-25, inclusive, are currently not known to PLAINTIFFS. They are joint venturers, agents, persons, or entities who worked together with FIREMAN'S FUND and benefitted from the wrongdoing PLAINTIFFS describe herein.

40. Defendants, DOES 26-50, inclusive, are currently not known to PLAINTIFFS. They are individuals, parent or subsidiary entities that issued substantial control over FIREMAN'S FUND, directed FIREMAN'S FUND's activities, left FIREMAN'S FUND undercapitalized and otherwise behaved in ways which made them alter egos of FIREMAN'S FUND such that the court may look to them to make FIREMAN'S FUND whole in the interests of justice.

41. PLAINTIFFS paid all necessary insurance premiums to obtain coverage under the POLICY and complied with the requirements of the POLICY in all respects, including mitigating all claims for covered losses as those terms are defined by the POLICY.

42. The DENIAL LETTERS also failed to comply with Insurance Regulation 2695.4 which requires a carrier to correctly notify a first party insured of all time limits which may apply to the claim presented by the claimant and thus FIREMAN'S FUND is estopped to assert a contractual limitations period contained in the POLICY.

**FIRST CAUSE OF ACTION—BREACH OF CONTRACT**
**(Business Income and Extra Expense Coverage)**

(AGAINST ALL DEFENDANTS)

43. PLAINTIFFS incorporate the preceding paragraphs by reference as if set forth here in full.

44. PLAINTIFFS purchased insurance which covered fire loss, including but not limited to Business Income or Extra Expense coverage afforded by Policy No. USC013480200 under Property-Gard Pinnacle Coverage Form 250000 01-13 of the POLICY.

45.     PLAINTIFFS paid premiums and otherwise complied with the material terms of the POLICY.

46.     PLAINTIFFS suffered a covered loss within the POLICY period, as described herein, and timely notified FIREMAN'S FUND of the loss as required by the POLICY.

47.     FIREMAN'S FUND denied covered benefits under the POLICY by faulty investigation and misapplication of POLICY terms and/or exclusion, and has not paid any benefits to PLAINTIFFS for this portion of PLAINTIFFS' claim.

48.     FIREMAN'S FUND's conduct has rendered the Business Income or Extra Expense Coverage provided by the POLICY illusory.

49.     This denial and refusal to pay benefits under the POLICY described herein subjected PLAINTIFFS to damages, including withheld POLICY benefits, special damages, consequential damages, and legal interest.

## SECOND CAUSE OF ACTION—BREACH OF CONTRACT
### (Civil Authority Business Access Coverage)

(AGAINST ALL DEFENDANTS)

50.     PLAINTIFFS incorporate the preceding paragraphs by reference as if set forth herein in full.

51.     PLAINTIFFS purchased insurance which covered fire loss, including but not limited to Civil Authority Business Access coverage afforded by Policy No. USC013480200 under Property-Gard Pinnacle Coverage Form 250000 01-13 of the POLICY.

52.     PLAINTIFFS paid premiums and otherwise complied with the material terms of the POLICY.

53.     PLAINTIFFS suffered a covered loss within the POLICY period and timely notified FIREMAN'S FUND of the loss as required by the POLICY.

54. FIREMAN'S FUND denied covered benefits under the POLICY by faulty investigation and misapplication of POLICY terms and/or exclusion, and has not paid any benefits to PLAINTIFFS for this portion of PLAINTIFFS' claim.

55. FIREMAN'S FUND's conduct has rendered the Civil Authority Business Access coverage provided by the POLICY illusory.

56. This denial and refusal to pay benefits under the POLICY described herein subjected PLAINTIFFS to damages, including withheld POLICY benefits, special damages, consequential damages, and legal interest.

**THIRD CAUSE OF ACTION — INSURANCE BAD FAITH**
**(Business Income and Extra Expense Coverage)**

(AGAINST ALL DEFENDANTS)

57. PLAINTIFFS incorporate the preceding paragraphs by reference as if set forth herein in full.

58. The self-interested investigation and the strained and illegal interpretation of the POLICY were intended to, and did, put FIREMAN'S FUND's interest in profits far ahead of PLAINTIFFS' financial interests.

59. PLAINTIFFS' claim for Business Income or Extra Expense was handled unreasonably, with the bad faith intent to deny the benefits under the POLICY.

60. Because of FIREMAN'S FUND's breach, PLAINTIFFS suffered damages including legal, expert, and other costs to secure withheld policy benefits, special damages, consequential damages, and legal interest.

61. FIREMAN'S FUND's unreasonable and bad faith behavior is clear in the handling of PLAINTIFFS' claim and in the handling of similar claims, which evidence a pattern and practice by FIREMAN'S FUND to knowingly violate California law in order to gain profit at the expense of California consumers.

62. FIREMAN'S FUND's conduct has rendered the Business Income or Extra Expense Coverage provided by the POLICY illusory.

63. The denial of PLAINTIFFS' claim was done by managing agents to whom authority was delegated to approve or deny claims, with full knowledge that an improperly denied claim can result in physical and financial ruin for insureds. The denial was knowing and intentional, by experienced insurance professionals who knew PLAINTIFFS were entitled to coverage and thus was done in conscious disregard of their rights. The wrongful conduct described herein was done with malice, fraud, and oppression such that punitive damages are appropriate to punish, make an example of and otherwise discourage such behavior.

### FOURTH CAUSE OF ACTION — INSURANCE BAD FAITH
### (Civil Authority Business Access Coverage)

(AGAINST ALL DEFENDANTS)

64. PLAINTIFFS incorporate the preceding paragraphs by reference as if set forth herein in full.

65. The self-interested investigation and the strained and illegal interpretation of the POLICY were intended to, and did, put FIREMAN'S FUND's interest in profits far ahead of PLAINTIFFS' financial interests.

66. PLAINTIFFS' claim for Civil Authority Business Access coverage was handled unreasonably, with the bad faith intent to deny the benefits under the POLICY, as described herein.

67. Because of FIREMAN'S FUND's breach, PLAINTIFFS suffered damages including legal, expert, and other costs to secure withheld policy benefits, special damages, consequential damages, and legal interest.

68. FIREMAN'S FUND's unreasonable and bad faith behavior is clear in the handling of PLAINTIFFS' claim and in the handling of similar claims, which evidence a pattern and practice by FIREMAN'S FUND to knowingly violate California law in order to gain profit at the expense of California consumers.

69. FIREMAN'S FUND's conduct has rendered the Civil Authority Business Access Coverage provided by the POLICY illusory.

70. The denial of PLAINTIFFS' claim was done by managing agents to whom authority was delegated to approve or deny claims, with full knowledge that an improperly denied claim can result in physical and financial ruin for insureds. The denial was knowing and intentional, by experienced insurance professionals who knew PLAINTIFFS were entitled to coverage and thus was done in conscious disregard of their rights. The wrongful conduct described herein was done with malice, fraud, and oppression such that punitive damages are appropriate to punish, make an example of and otherwise discourage such behavior.

WHEREFORE, PLAINTIFFS pray for relief as follows:

FOR THE FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT:

1. Compensatory damages according to proof,
2. Prejudgment and Post-judgment Interest,
3. Attorney fees expended to obtain policy benefits.
4. Any further relief to which Plaintiff is entitled, at law or equity.

FOR THE SECOND CAUSE OF ACTION FOR BREACH OF CONTRACT:

1. Compensatory damages according to proof.
2. Prejudgment and Post-judgment Interest.
3. Attorney fees expended to obtain policy benefits.
4. Any further relief to which PLAINTIFFS are entitled, at law or equity.

FOR THE THIRD CAUSE OF ACTION FOR INSURANCE BAD FAITH:

1. Compensatory damages according to proof.
2. Noneconomic damages.
3. *Brandt* Fees incurred to obtain the benefits of the contract.
4. Special Damages.
5. Punitive damages according to proof.

      6.      Any further relief to which PLAINTIFFS are entitled, at law or equity.

FOR THE FOURTH CAUSE OF ACTION FOR INSURANCE BAD FAITH:

      1.      Compensatory damages according to proof.

      2.      Noneconomic damages.

      3.      *Brandt* Fees incurred to obtain the benefits of the contract.

      4.      Special Damages.

      5.      Punitive damages according to proof.

      6.      Any further relief to which PLAINTIFFS are entitled, at law or equity.

DATED: May 30, 2023                              MILLSTEIN FELLNER LLP

By: _____
David J. Millstein
Jason E. Fellner
Attorneys for Plaintiffs
ONE TRUE VINE, LLC